UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 1:23-cv-20364-MOORE/LOUIS

DOMENICO CALCATERRA,

    Plaintiff,

vs.

BAPTIST HEALTH SOUTH FLORIDA, INC,
a Florida Corporation,
BETHESDA HEALTH PHYSICIAN
GROUP, INC., a Florida Corporation,

    Defendants.
_____/

## AMENDED COMPLAINT

Plaintiff, DOMENICO CALCATERRA (hereinafter "DR. CALCATERRA") sues Defendants, BAPTIST HEALTH SOUTH FLORIDA, INC, (hereinafter "BAPTIST") and BETHESDA HEALTH PHYSICIAN GROUP, INC. (hereinafter "BETHESDA"), and states as follows in support thereof:

## JURISDICTION AND VENUE

1. DR. CALCATERRA is a resident of Palm Beach County and formerly worked for BAPTIST and BETHESDA.

2. BAPTIST is a Florida corporation with a principal place of business in Miami-Dade County, Florida and is within the jurisdiction of this Court.

3. BETHESDA is a Florida corporation with a principal place of business in Palm Beach County, Florida.

## PARTIES

4. DR. CALCATERRA was, at all times material to this Complaint, employed by BAPTIST and BETHESDA in Palm Beach County.

5. BAPTIST is in the business of providing hospital care and other medical services to members of the public in the South Florida area.

6. BETHESDA is in the business of providing hospital care and other medical services to members of the public in the South Florida area at Bethesda Hospital East.

7. Bethesda Hospital East is in the business of providing hospital care and other medical services to members of the public in the South Florida area at Bethesda Hospital East.

8. Bethesda Hospital East is owned by BAPTIST and may be considered a "single entity" employer in relation to BAPTIST.

9. BETHESDA is owned by BAPTIST and may be considered a "single entity" employer in relation to BAPTIST.

10. The human resource functions for BETHESDA is integrated with that of BAPTIST.

11. Any individual who applies for a job with BETHESDA or Bethesda Hospital East online is directed to BAPTIST.

12. BETHESDA presents itself to the public as being a part of the BAPTIST health system. The website for BETHESDA reflects that BETHESDA is part of the BAPTIST system and BETHESDA's facilities, website(s), employee and medical doctor name tags and public areas all contain the pineapple logo used by BAPTIST.

13. The Chief Medical Officer for BAPTIST is also responsible for BETHESDA's compliance with federal law.

14. BAPTIST is compensated by the Federal government's Medicare and Medicaid programs.

15. BETHESDA is compensated by the Federal government's Medicare and Medicaid programs.

**FACTS**

**DR. CALCATERRA's work history**

16. DR. CALCATERRA is an accomplished cardiothoracic surgeon who is regarded as an international expert on aortic pathologies and aortic dissections as shown by his clinical and academic record.

17. DR. CALCATERRA was recruited and hired by Defendants to help build a modern cardiac surgery program in a hospital that had struggled for years with its practices and reputation (Bethesda East).

18. In January 2020, DR. CALCATERRA started as the Chief of Cardiac Surgery at BETHESDA.

19. Defendants are compensated by the federal government's Medicare and Medicaid programs, as well as by private insurance payors.

20. As a Medicare-certified institutional provider, Defendants are required to submit an annual Cost Report to a Medicare Administrative Contractor. The Cost Report contains provider information such as facility characteristics, utilization data, cost, and charges by cost center (in total and for Medicare), Medicare settlement data, and financial statement data. The Cost Report requires an attestation that the misrepresentation or falsification of any information may be punishable by federal law. The Cost Report also requires that the signatory officer be "familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." Defendants also attest and expressly certify their compliance with healthcare laws in all claims for payment sent to federal healthcare programs. Thus, every claim to a federally funded healthcare program certifies that the services rendered met an acceptable standard of care. The government expects healthcare institutions to meet a certain standard and when that standard is not met, the claim for Medicare or Medicaid reimbursement is false.

21. As Medicare and Medicaid providers, Defendants expressly certify their compliance with the healthcare laws in, *inter alia*, the aforementioned Cost Reports.

**Overview of DR. CALCATERRA's complaints**

22. DR. CALCATERRA opposed, refused to participate in, reported and made efforts to stop various violations of law and clinical practices he observed which jeopardized quality of care and patients' lives causing severe patient harm (or even death) and/or sometimes resulting in fraudulent billing to the United States government during his tenure as Chief of Cardiac Surgery for BETHESDA from January 2020 through in or about January 2021.

23. Defendants allowed a culture of substandard care to exist at Bethesda Hospital to maximize profits or revenue. Defendants regularly contrived ways to extend patient hospital stays by causing or contriving additional patient conditions. Insurance payors require hospitals to categorize patient diagnoses into distinct groups commonly referred to as diagnosis related groups (DRGs). Each DRG has an average expected length of hospital stay, sometimes referred to as average length of stay (ALOS). Defendants often exceeded the average length of stay at Bethesda Hospital due to substandard care.

24. As is reflected in an e-mail provided to DR. CALCATERRA by a concerned employee, these practices existed before DR. CALCATERRA began to work for Defendants and were part of the reason there was a high turnover of cardiac surgeons prior to the time that DR. CALCATERRA began to work for Defendants.

25. BETHESDA and BAPTIST had been cited several times before the start of DR. CALCATERRA's employment for violations of state and federal patients' rights laws. Defendants often displayed a disregard for the statutory and other requirements under which BETHESDA and BAPTIST operates. For example, BAPTIST has been involved in repeated situations where one surgeon, has performed surgical operations as the primary operator without having been credentialed by the payor insurance company. Defendants had another surgeon "assist" the operating surgeon in order to get around the credentialing requirement and process insurance claims which falsely reflected the assisting surgeon as the main operating surgeon, in order to collect the insurance payments.

26. DR. CALCATERRA complained about the unlawful practices of Defendants on numerous occasions to different levels of the administrations and also repeatedly, both verbally and in writing, since his remarks were never acknowledged or addressed.

27. Defendants rarely responded to DR. CALCATERRA's verbal complaints or e-mails in this regard. Those rare e-mail responses were cursory and/or non-responsive.

**Fraudulent Billing**

28. In January 2020, DR. CALCATERRA noticed that entries on a patient chart and the electronic medical records reflected that several unnecessary consultations were requested for a patient on which Dr. Calcaterra had operated on. The records revealed that

a physician at BETHESDA requested multiple specialists' consultations even though these services were totally unnecessary. DR. CALCATERRA directly inquired about these facts. and the doctor (Dr. Jennings) responded - "we take care of many uninsured patients here and we have to compensate for the work we do for free, so we take care of each other." Thus, that particular physician specialist regularly generated numerous unnecessary consultations on his own patients and on the patients of other doctors in order to unlawfully benefit other private physician practitioners through the billing of unnecessary medical evaluations, with a system known as "overutilization" and an inflated use of medical services.

29. Further, upon information and belief, Dr. Daniel Goldman, Chief Medical Officer at BETHESDA, called a physician associated with Florida Atlantic, Dr. Daniel Gutman (Assistant Program Director Internal Medicine Residency Program with Florida Atlantic University) into his office and demanded that the he implement a system of systematic consultation of medical services that would make consultations with specialists practically routine in every case, even though Dr. Gutman refused to become part of this type of practice.

30. This was done to increase billing and revenues through fraudulent means, once again implementing the fraudulent practice of "overutilization".

31. Physicians at Bethesda Hospital routinely consult other physicians for the care of patients who are not in need of their specialty for the sole purpose of increasing hospital billing. In addition, many of these physicians do not spend the requisite time needed for billing for a given code, according to DRG requirements, per the Centers for Medicare and Medicaid Services' (CMS), including Critical Care billing time.

32. DR. CALCATERRA, in fact, also objected, in writing, about Defendants' fraudulent and unlawful billing practices regarding the billing and coding for "critical care time" or other services that were not actually provided or which would not qualify for "Critical Care billing", within the meaning of rules and regulations set by the Centers for Medicare and Medicaid Services (CMS) guidelines.

33. These unlawful practices related to the billing of Critical Care time account for tens of millions of dollars per year of fraudulent billing for Defendants at the different Baptist Hospitals, which all adopt the same unlawful practices to inflate billing. Dr.

Calcaterra in person, along with one of his Critical Care physician colleague, Dr. Christopher Mallow, reported verbally and in writing these facts to the Bethesda chain of command.

34. These unnecessary and excessive consultations were also disruptive to the quality of the care given to patients. DR. CALCATERRA made his objections to the practice of overutilization known to Jane Kiah, Assistant Vice President and the Chief Medical Officer, Dr. Goldman and others. The issue was never addressed and no action of any type was ever taken.

35. In February of 2020, DR. CALCATERRA and the Chief of Cardiac Anesthesia, Dr. Carlos Rico, met with the Chief Operating Officer, Ela Lena, and shared concerns about the Hospital's overutilization practices, and even expressed an interest in speaking with Defendants' compliance department about these various issues. DR. CALCATERRA specifically told Lena about Dr. Jennings statements and his observation that there were improper entries in patient charts. The director stated that the issue would be referred to the compliance department, as is required by federal law, but that was never done. Lena acknowledged in an e-mail to DR. CALCATERRA that Defendants needed to "ensure that the issues you raised relative to utilization…" are "not occurring" and that she had referred such issues to the compliance department and that the compliance department would reach out to DR. CALCATERRA. Lena was abruptly fired a few weeks later.

**Substandard care/EMTALA**

36. In July of 2020, a 48-year-old African American male with no health insurance was seen in the emergency room by one of BETHESDA's physicians. The treating physician/cardiac surgery specialist on call told the patient and his wife that he had seen this heart condition the patient suffered "heal itself" with no surgery, and that the risk of surgery outweighed the risk of inaction. The patient and his wife elected to not have surgery based on his advice. Two other physicians at BETHESDA caring for the patient, Dr. Christopher Mallow and Dr. Adil Sanaulla, each became concerned about the cardiac surgeon's clinical management and decision. These physicians became so concerned that DR. CALCATERRA was asked to give a second opinion. DR. CALCATERRA examined the patient the next day and learned that he had a type-A aortic dissection, which meant

that the wall of the patient's aorta was so damaged that blood flowed outside of the lumen of the vessel. Studies show that there was a 90% chance that such a condition would result in the rupture of the aorta vessel within forty-eight (48) hours without surgery. Incredibly, the treating physician did not document these details in the patient's chart, but did document in the medical records that the patient had "refused the operation", also placing in the chart a "Do Not Intubate-Do Not Resuscitate" (DNR) order, which implies that in case of the patient's clinical deterioration, no medical rescue measures of any type would be implemented, although the patient was in his 40's and he was no affected by any untreatable clinical condition.

37. DR. CALCATERRA advised the patient and his wife of the risk of not having surgery. DR. CALCATERRA strongly advised the patient to have the surgery, despite the difficulty of the procedure, because of the substantial risk of death through inaction. This clinical condition represents an absolute indication for an emergent operation to prevent the patient's imminent death. DR. CALCATERRA based his opinion on studies which showed that there was a 90-95% chance that the patient's aorta would rupture within 48 hours. The patient and his wife elected to have the surgery. DR. CALCATERRA performed the lifesaving operation immediately on his (DR. CALCATERRA's) July 4th holiday time, although he was not on call that day.

38. Defendants refused to provide the patient with a lifesaving operation because of his race and/or his inability to pay, in violation of EMTALA. The patient and his wife later complained race discrimination and discrimination against the uninsured to BAPTIST's corporate office.

39. The treating physician also recommended that the patient agree to a Do Not Resuscitate Order (DNRO) despite his young age. The treating physician's failure to recognize the substantial risk associated with the patient's condition and/or to explain the likely outcome to the patient meant that the patient and his wife were not given "informed consent" of the DNRO in violation of Fla Stat. § 765.205 as well as state and federal law concerning patients' rights. The treating physician not only denied the patient a life-saving operation but also failed to offer him the opportunity to be treated by DR. CALCATERRA, an expert in aortic pathologies, or of transfer the patient to another facility to have the life-saving operation performed.

40. DR. CALCATERRA and others observed that occurrences such as the foregoing happened at BETHESDA. Young patients with emergent clinical conditions similar to the one affecting this patient have been routinely denied a life-saving operation and sometimes expired during an unlawful implementation of a DNR/DRI order in violation of the Emergency Medical Treatment and Active Labor Act (EMTALA) and in violation of State and Federal laws.

41. Defendants receive federal funding to treat the uninsured. Defendants had a pattern at Bethesda hospital to withhold treatment including needed operations to the uninsured to avoid the expenditure of resources for which there would be no compensation or compensation at a rate far less that an insured or Medicare patient would generate. This was confirmed when DR. CALCATERRA brought this near tragic incident to the attention of the Director of Defendant's Risk Management Office who stated that the hospital administration had been unwilling to address such issues an issue for years despite several instances of patients' harm.

**Lengthy Hospital Stays**

42. Other instances of substandard care led patients to have longer than expected hospital stays. On May 29, 2020, DR. CALCATERRA again complained to Kiah, via e-mail, about a patient who had been in the hospital for five weeks because nothing had been done to treat the patient in a competent manner. As a result, the patient required that diuretics be administered intravenously in an emergent manner to avoid the life-threatening condition of pulmonary edema, or fluid in the lungs and around the heart.

43. On June 14, 2020, DR. CALCATERRA reported, verbally and via e-mail, about another patient who had been in the hospital for more than fifty (50) days. These and other patients had unusually long hospital stays because, *inter alia*, there was no plan of care formulated for such patients, in violation of, *inter alia*, state and federal laws concerning patients' rights (Fla. Stat. § 381.026 and 42 C.F.R. § 482.13), as DR. CALCATERRA complained about it repeatedly. DR. CALCATERRA also expressed concern that the patient was scheduled for surgery and yet had never met the surgeon who was to perform the surgery, and that there was no plan of care to address the symptoms

which militate against surgery; nor had the patient and his family been made aware of the risks of surgery.   DR. CALCATERRA wrote:

> "I am very concerned about the dynamics that I am witnessing since in my opinion what is going on is hindering our ability of delivering adequate care to our patients."

DR. CALCATERRA complained about various issues, including that same surgeon's proclivity to book surgeries without seeing the patient first, in another e-mail on August 12, 2020.

44. Physicians and residents from Florida International University (FAU) also expressed concerns about a cardiac surgeon's practices and substandard care delivered. Meetings were held with FAU staff to address their concerns and on July 7, 2020, DR. CALCATERRA asked that a meeting concerning FAU's "complaints and concerns (dating 2 years back)," should be memorialized. However, that was not done.

45. DR. CALCATERRA also complained of intubated and other critical care patients being transferred to the catheterization laboratory without the proper anesthesia which he complained "is not safe and does not meet the basic criteria of Standard of Care."

46. On July 23, 2020, DR. CALCATERRA complained of issues involving Intensive Care Unit (ICU) Orders.

**Physicians practicing outside of their scope of practice**

47. DR. CALCATERRA also noticed and complained about physicians performing procedures outside the scope of their practice.  On one occasion, a physician specialized in General Surgery implanted a pacemaker into a patient despite his lack of expertise and qualification to perform this procedure. The pacemaker was improperly implanted, and contrary to any clinical justification.  The patient died. The physician in question has no Medical Board eligibility and Medical Board certification to perform that procedure, nonetheless, the hospital is complicit of physicians performing procedures outside their scope of practice to inflate revenues, although these practices perform by legally unqualified physicians cause irreparable patients' harm.

### Other violations – Post-operative care

48. DR. CALCATERRA complained about several unconventional and unsafe clinical practices that were in place as part of routine delivery of care at Bethesda Heart Hospital. These practices included transferring patients to the regular ward with intravenous central-line catheters which, by product label and standard of practice, cannot be in place outside of an intensive care unit (ICU). DR. CALCATERRA determined that these catheters were removed at a bedside by registered nurses with no supervision by physicians (or advanced providers) as recommended by the standard of care and without basic precautions to avoid the potential occurrence of life-threatening complications. Furthermore, DR. CALCATERRA complained about dangerous anti-arrhythmic medications that were routinely maintained, without existing clinical justification, through an intravenous infusion for an unreasonable duration of several days beyond the label-recommendation exposing the patients to the occurrence of life-threatening overdosage. The number of deaths (believed to be eleven (11) in the year prior to DR. CALCATERRA's hire) that resulted from such practices plummeted after DR. CALCATERRA doggedly insisted that the situation be changed.

49. DR. CALCATERRA also complained about other concerns such as lack of basic equipment needed for adequate medical care. Such complaints included the lack of ultrafiltration for emergent dialysis, a lack of a basic ability to process coagulation laboratory tests. Bethesda lacked adequate equipment to provide timely coagulation test results. Such tests are crucial to cardiac care because they measure how long it takes for a patient's blood to clot and are therefore crucial before and after heart surgery. Bethesda was unable to measure these tests accurately and needed to get these tests' results from outside laboratories, which took several hours. Because time is of the essence when it comes to heart surgery, it was dangerous to not have immediate access to such tests onsite. On July 15, 2020, DR. CALCATERRA again complained about outdated lab equipment stating that it was a "serious situation that we need to address promptly," and that "[t]his is not standard of care any longer in most cardiac surgery programs." DR. CALCATERRA even cited a specific case which caused a problem and stated it was an "important safety issue." The issue was not resolved as of the time of DR. CALCATERRA's departure from the employ of Defendants.

50. Mrs. Kiah acknowledged the problem in a rare response to DR. CALCATERRA's concerns.

51. DR. CALCATERRA complained about similar issues on July 17, 2020, when he complained of Bethesda's practice of booking and then canceling cases causing dangerous delays.

52. On July 19, 2020, DR. CALCATERRA complained about issues with Defendants' failure to provide a Peripherally Inserted Central Catheter Line (PICC) for a patient, which is a line that extends through the skin to a central vein to provide intravenous therapy. It is used to deliver treatments directly to the large central veins near the heart. The delay in providing such a line in a timely fashion to the patient raised a danger of a life-threatening sepsis infection. One registered nurse involved in the process noted that there was an issue with the protocols involving the placement of PICC lines.

**Lack of proper credentialing**

53. DR. CALCATERRA also complained about the lack of proper credentialing of new personnel, as well as lack of basic processes and resources to meet the requisite "standard of care," such as lack of written protocols for the transfer of critical patients to and from the Catheterization Laboratory, lack of Continuous Renal Replacement Therapy (CRRT), necessary to treat postoperative dialysis patients, and lack of basic laboratory anticoagulation tests necessary to monitor patients' clotting status after surgery.

54. In May 2020, Kiah, texted with DR. CALCATERRA and advised that the lead perfusionist was on leave all weekend that another perfusionist would cover her for the weekend. A qualified perfusionist is crucial to patient safety because the position requires the operation of the heart-lung machine that keeps patients alive during surgery. Kiah texted DR. CALCATERRA "I would rather not use him if possible." DR. CALCATERRA replied that if there was an emergency, he would not have a choice and asked why she was hesitant. Kiah replied that he had not been "set up in HR yet…" and that she was "hoping it stays quiet." DR. CALCATERRA learned that the new perfusionist had not been credentialed before being made available as the only perfusionist on duty. Doing so, Mrs. Kiah established unsafe and illegal conditions of delivery of care

since without completing a credentialing process, could not be determined if the provider in question met the required qualification to perform his duties.

### Coverage Issues

55. On March 28, 2020, Dr. DR. CALCATERRA filed a written report memorializing his concerns concerning the failure of physician assistants to apply the appropriate standard of care. He sent follow-ups on the same subject without the issue being rectified.

56. DR. CALCATERRA expressed his concerns about the poor quality of assistance he was receiving in the operating room and in the ICU in these reports. DR. CALCATERRA also complained about the failure of Physician Assistants (PAs) to apply the appropriate quality of care, along with lack of basic policies and protocols required by federal law. DR. CALCATERRA noted to at least one manager that another similarly sized hospital in the area had a ratio of three experienced PA's to one staff surgeon and one locum surgeon while BETHESDA had only "one inexperienced PA working with 2 surgeons."

57. On August 4, 2020, DR. CALCATERRA complained about "inconsistent PA coverage, no coverage from another cardiac surgeon and absent or inconsistent ICU coverage." DR. CALCATERRA complained that a lack of PA coverage endangered his patients who were in the ICU. He also reiterated that he had written management about a month earlier that the lack of PA coverage endangered patient lives. DR. CALCATERRA also complained about a lack of proper PA coverage in the operating room. DR. CALCATERRA wrote that the situation was so dire it had to be addressed right away and that it was not only illegal, but unfair to patients to ask the only current PA to pick up even more shifts rather than hire additional ones. DR. CALCATERRA also wrote:

> "The many concerns I have brought up through the months about problems with operations, processes and quality of care have not been addressed and acknowledged. Accordingly, problems of the same type raised in writing by physicians from other services, like the FAU Internal Medicine attendings, have been ignored as well."

58. Bert Mosely, President of Bethesda Physicians' Group, objected to hiring more personnel and even wrote to DR. CALCATERRA: "[s]o we're being asked to spend

an awful lot of money here…is there a reason why [a PA], who we're already paying, can't assist?" DR. CALCATERRA had complained on several occasions about the PA even stating that he believed it was "unsafe having her doing a case in the OR,", because of her poor technical skills and abilities.

59. On August 24, 2020, Dr. Kiah acknowledged that there were "significant coverage issues and difficulty managing the workload." However, nothing was done to address the coverage issues that posed a danger to the safety of patients.

60. On August 12, 2020, DR. CALCATERRA sent an email to again express concerns over the quality of care and lack of coverage when he was off duty. He also pointed out that a number of his coworkers were "terrified" of speaking out due to possible retaliation. This is consistent with the observations of other medical professionals.

61. On September 8, 2020, DR. CALCATERRA sent another email demonstrating his continued frustration with the Hospital's quality of care, this time also expressing concerns over the lack of coverage for inpatients at an alarming rate.

62. DR. CALCATERRA sent follow-ups on the same subject without the issue being rectified.

63. On September 16, 2020, DR. CALCATERRA was asked to meet with then CEO of BETHESDA, Nelson Lazo about a matter. During that meeting, Lazo made it known to DR. CALCATERRA that he (Lazo) believed that DR. CALCATERRA had directed another doctor to contact BAPTIST's Chief Medical Officer at the time to complain about an illegality. CALCATERRA objected stating he had not made such a direction but that he himself had complained about various illegalities in the past. Lazo was skeptical and told DR. CALCATERRA that if he talked to anybody at BAPTIST again DR. CALCATERRA would be terminated on the spot.

64. Less than three (3) months later, DR. CALCATERRA was notified that he was to be terminated. DR. CALCATERRA was not given any reason for the decision to terminate his employ.

65. On November 22, 2020 DR. CALCATERRA complained about an incident involving a patient in distress in the ICU and that there was a lack of any personnel to deal with a life-threatening situation. Dr. Kiah addressed the situation and wrote that the events discussed in DR. CALCATERRA's November 22, 2020 e-mail were "indeed concerning"

and "[w]e will investigate." However, no investigation was ever conducted; nor were any practices, policies or procedures changed in order to avoid another life threatening situation of a similar nature from occurring in the future.

### Complaints about COVID-19 protocols

66. Defendants left doors open to areas that were required to be closed and sterile, regularly housed patients who had COVID-19 in the same wards as patients who did not have COVID-19, and then allowed a nurse to treat patients without the proper protocols, among other violations. It is believed that dozens of individuals were unnecessarily infected with the COVID-19 as a result of these grossly negligent actions.

67. Bethesda East was given more than forty-five million dollars ($45,000,000) in funds from the Coronavirus Aid Relief and Economic Security Act (CARES) and yet did not devote the resources it was obligated to devote to COVID-19 protocols, related costs and staff increases in exchange for their receipt of those funds. Incredibly, Bethesda East received more money in provider relief funds that much larger hospital systems such as St. Josesph's Hospital, Tampa Florida, Shands Teaching Hospital, University of Miami and South Miami Hospital. BETHESDA received approximately the same amount as much larger hospitals such as Mt. Sinai Hospital, Miami Beach Florida, despite being approximately half the size of Mt. Sinai. Mt. Sinai Hospitals and other health care providers who received approximately the same amount as Defendants or less set up separate COVID-19 wards in or about March 2020 while Defendants dragged their feet for months in establishing such wards. Defendants had a lack of proper COVID-29 protocols which included the failure of nursing and other staff to wear the proper personal protective equipment and doors left open, among other violations. Medical staff contracted COVID-19 as a result of these failures and infected others.

68. DR. CALCATERRA complained about Bethesda's lack of COVID protocols in or about March 2020 through at least July 2020. DR. CALCATERRA complained verbally and through text messages with managers who acknowledged the dangers posed by Defendants' inaction with regard to proper COVID-19 protocols. One manager even wrote that she had "raised a big stink" about the issue and that there were "at least 30 people exposed" unnecessarily. That manager also wrote: "I told the

administration that they are jeopardizing the health of the entire community and they promised me they were going to act properly."

### FALSE CLAIMS ACT VIOLATION (Retaliation)
### 31 U.S.C. § 3730(h)

69. The whistleblower protection provision of the FCA, 31 U.S.C. § 3730(h), protects an employee from retaliation for lawful acts done by the employee in furtherance of an action under § 3730 or other efforts to stop one or more violations of the FCA.

70. More specifically, § 3730(h) prohibits "any manner of discrimination" against an employee or agent if the employee or agent takes any action in furtherance of § 3730 (h) or 31 U.S.C. Subchapter III.

71. DR. CALCATERRA took numerous actions to stop violations of the FCA and related statutes, including but not limited to, his complaints about overbilling and improper utilization.

72. Defendants' actions in providing substandard or even negligent care meant that the Cost Reports were fraudulent.

73. As set forth above, DR. CALCATERRA was an employee of BAPTIST who engaged in protected activity designed to stop one or more FCA violations.

74. Defendants had actual and direct knowledge of DR. CALCATERRA's protected activity as his complaints about Defendants' fraudulent and unlawful practices were made directly to management, both orally and in writing, using language sufficient to put Bethesda and Defendants' administrators on notice that he engaged in protected activities.

75. Defendants retaliated against DR. CALCATERRA as described above, by harassing, isolating, and terminating him from all positions, solely on account of his protected activity and not for any legitimate reason.

76. DR. CALCATERRA's termination was to be effective in March 2021.

77. Pursuant to 31 U.S.C. § 3730(h)(1)&(2), DR. CALCATERRA is entitled to "all relief necessary" to be made whole, including reinstatement with the same seniority status that the employee … would have had but for the discrimination, two (2) times the amount of back pay, interest on the back pay, front pay, and compensation for any special

damages sustained as a result of the discrimination including litigation costs and reasonable attorneys' fees.

## JURY DEMAND

DR. CALCATERRA demands trial by jury on all issues so triable.

Respectfully submitted,

/s Gary A. Costales
Gary A Costales
Florida Bar No. 0948829

Law Office of
Gary A. Costales, P.A.
1533 Sunset Drive, Suite 150
Miami, FL 33143
Telephone: (786) 448-7288
(786) 446-7298 (direct)
(305) 323-7274 (facsimile)
E-mail: costalesgary@hotmail.com

/s Tina Glandian
Tina Glandian
Florida Bar No. 101093
256 5th Avenue, 4th Floor
New York, NY 10001
Office (213) 625-3900
Facsimile (213) 232-3255
Email: Geragos@Geragos.com

Attorneys for Domenico Calcaterra

## CERTIFICATE OF SERVICE

**I hereby certify** that on March 6, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on

16

the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s Gary A. Costales

### SERVICE LIST

*DOMENICO CALCATERRA v. BAPTIST HEALTH SOUTH FLORIDA INC AND BETHESDA HEALTH PHYSICIAN GROUP, INC*
*CASE NO.: 23-CV-20364-Moore/Louis*

*UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA*

Christopher M. Yannuzzi, Esq.
E-mail: Yannuzzi@irlaw.com

Eric D. Isicoff, Esq.
E-mail: Isicoff@irlaw.com

Teresa Ragatz
E-mail: Ragatz@irlaw.com

ISICOFF RAGATZ
601 Brickell Key Drive, Suite 750
Miami, Florida 33131
Telephone: (305) 373-3232
Facsimile: (305) 373-3233
Attorneys for Defendants
*Notice of Electronic Filing*

Gary A. Costales, Esq.
E-mail: costalesgary@hotmail.com

Gary A. Costales, P.A.
1533 Sunset Drive, Suite 150
Miami, Florida 33143
Telephone: (786) 446-7288
Facsimile: (786) 323-7274
Attorney for Plaintiff
*Notice of Electronic Filing*

Tina Glandian, Esq.
E-mail: tina@geragos.com
E-mail: geragos@geragos.com

Geragos & Geragos
256 5th Avenue, 4th Floor
New York, NY 10001
Tel.: (213) 625-3900
Fax: (213) 232-3255
Attorney for Plaintiff
*Notice of Electronic Filing*